**ST. PAUL FIRE & MARINE INSURANCE COMPANY, Plaintiff-Appellant,**

v.

**MAYOR'S JEWELERS OF FORT LAUDERDALE, INC., and Mayor's Jewelers of Dadeland, Inc., Deefndants-Appellees.**

**No. 71–1883.**

United States Court of Appeals, Fifth Circuit.

Aug. 11, 1972.

---

318

Eugene L. Heinrich, Fort Lauderdale, Fla., Jeanne Heyward, Miami, Fla., for plaintiff-appellant.

Sam Daniels, Sams, Anderson, Alper & Spencer, Miami, Fla., for defendants-appellees.

Before JOHN R. BROWN, Chief Judge, and AINSWORTH and INGRAHAM, Circuit Judges.

JOHN R. BROWN, Chief Judge:

In another of those *Erie* cases where Federal Judges are called upon to conjure up a Florida solution under principles of Florida law to a Florida insurance dispute,[1] we are here asked to unravel the cabalic meaning of a Florida statute cryptogrammically denominated F.S. § 627.01081, F.S.A. and apply its recondite intent to Clause 2(A) of Jeweler's Block Policy No. 366 HA 6590 and Clause 2(B)(3) of Jeweler's Block Policy Nos. 366 HA 6584 and 366 HA 6585.[2]

---

1. Cf., Prudential Ins. Co. v. Clark & Clark, 5 Cir., 1972, 456 F.2d 932; Mendelson v. General Ins. Co., 5 Cir., 1972, 455 F.2d 270; Houdaille Industries, Inc. v. United Bonding Ins. Co., 5 Cir., 1972, 453 F.2d 1048; Allstate Ins. Co. v. Employers Liability Assurance Corp., 5 Cir., 1971, 445 F.2d 1278.

2. LIMITATIONS OF LIABILITY
2. The maximum liability of the Company resulting from any one loss, disaster or casualty is limited to

In weaving through this maze of arithmetic appellations, the District Court, perhaps understandably, made some clearly erroneous findings. Accordingly, we reverse in part and affirm in part the District Court's declaratory order granting full recovery to the assureds.

### I. The Facts—Line Security That Wasn't There

The facts, as they emerge from what turns out to be a virtually undisputed though less than luminous record, indicate the following occurrences. In July, 1968, Mayor's Jewelry Stores, through its president (Getz) and its vice president (Shore) obtained Jeweler's Block Insurance policies from St. Paul Insurance Company (St. Paul) for six of its wholly owned stores, including Mayor's Jewelers of Ft. Lauderdale (Ft. Lauderdale), Mayor's Jewelers of Dadeland, Dadeland Mall (Dadeland Mall) and Mayor's Jewelers of Dadeland, Sunset Drive (Sunset). The policies carried primary insurance in the amount of

(A) $300,000.00 in respect of property at the Insured's premises as described herein;

(B) $250,000.00 in respect of property which is (1) in transit by first class registered mail, or railway express (subject to the stipulations of Exclusion (E) of Section 5) or by armored car service; (2) deposited in the safe or vault of a bank or safe deposit company; (3) in the custody of a dealer in property of the kind insured hereunder not employed by or associated with the Insured, but property deposited for safe keeping with such a dealer by the Insured or its authorized representatives while traveling is subject to the limit expressed in Clause E of this Section;

(C) $50,000.00 in respect of shipments in transit by first class registered air mail or air express (subject to the stipulations of Exclusion (E) of Section 5) sent to any one addressee at any one address during any one day;

(D) $25,000.00 in respect of shipments in transit by customer parcel delivery service and the parcel transportation service of railroads, waterborne or air carriers and passenger bus lines (subject to the stipulations of Exclusion (E) of Section 5);

$300,000 each, so far as the pertinent provision—Clause 2(A)[3]—is concerned.

In early 1969, Shore contacted St. Paul's general agent (Schuh) seeking to increase this coverage by $200,000 on the Ft. Lauderdale policy. Schuh told Shore that he would have to check with insurer's head underwriter (Washick), whom he called immediately. Washick told Schuh that he would not increase the coverage to a total of $500,000, but that he would increase coverage $100,000 to $400,000 if the assured had an antiburglary device known as "ADT line security."[4] Schuh relayed this information to Shore who replied that he did not know whether or not this particular system had been installed in the Ft. Lauderdale location, and that he would have to call ADT to find out.[5]

Shore called ADT and was told that the Ft. Lauderdale store did have line security and had had it since its inception. Shore then called Schuh and told him that ADT had told him that Ft. Lauderdale had the system. Upon re-

(E) $25,000.00 in respect of property elsewhere and not included in Clauses (A), (B), (C) and (D) above or otherwise limited herein.

3. "The maximum liability of the Company resulting from any one loss, disaster or casualty is limited to (A) $300,000 in respect of property at the Insured's premises as described herein; * * *." See note 2, *supra.*

4. ADT line security is an electronic device which tells ADT when the other premises protective devices have been defeated. ADT has a central system which is supposed to sound an alarm if the jeweler's premises or safes are violated. If the apparently sophisticated thieves have ways around the usual ADT devices and defeat the central alarm system, the purpose of line security is to warn ADT that the central alarm system has somehow been deactivated.

5. ADT line security is not visible. The only way one could learn whether or not line security existed at a given location is to ask ADT, because not even a qualified engineer could tell by an inspection of the premises. Apparently, that is because the line security equipment is located in the alarm company's central station.

ceipt of this information Schuh told Shore on February 3, 1969, that Ft. Lauderdale had the $100,000 increase on 2(A) coverage. Schuh then called and wrote Washick that on Washick's advice he had bound the additional coverage.[6] The binder was confirmed by St. Paul by Endorsement No. 9, issued February 6, 1969, with an effective date of February 3, 1969.

Sometime during the weekend of March 30, 1969, the Ft. Lauderdale store was burglarized with a loss of nearly $700,000 worth of merchandise.

Unhappily, the Ft. Lauderdale store did not have protection of an ADT line security system after all, as had been thought.

## II. No Misrepresentation

St. Paul's first contention is that it is entitled to cancel the increase in 2(A) coverage and avoid the additional liability ($100,000) because Shore's statements about the ADT line security system amounted to a material misrepresentation of fact, substantially affecting the risk of the insurer, on which the insurer had reasonably relied in extending coverage.

The argument can be readily disposed of. Shore simply did not misrepresent anything. All Shore told Schuh was that he did not know whether or not Ft.

Lauderdale had this particular protection and that he would have to find out from ADT.[7]

Thereafter, Shore called ADT and then reported back to Schuh *that ADT had told him* that Ft. Lauderdale was protected with line security. This was the statement on which the insurer relied. It was the inquiry which the insurer called for, and the answer as to what ADT advised was faithfully reported to St. Paul. There was no misrepresentation here.

Therefore, since there was actually no misrepresentation of fact, F.S. 627.-01081[8] F.S.A., is not even involved even though it is conceded that the critical fact was material to the risk.

St. Paul's argument that Getz' February 3 letter to St. Paul, which was not received until days after the extended coverage had been bound, materially misled the insurer is likewise without merit. Statements made after coverage has been afforded are immaterial. World Insurance Company v. Posey, Fla.App., 1969, 227 So.2d 67; Aetna Insurance Company v. Kacharos, Ala.Sup. Ct., 1933, 226 Ala. 504, 147 So. 438. Coverage had been bound days before the Getz letter could have been received. This obvious fact renders unnecessary any discussion of whether reliance on the letter could have been reasonable, in

---

6. Thereafter, on February 3, 1969, Getz also wrote Washick stating that "we have definitely installed this system and it has been in operation for many months." This letter, however, could not have been received by St. Paul before February 3, 1969, the date on which the extended coverage was bound.

7. In fact, Schuh himself had suggested that Shore seek to obtain the information from ADT. And Washick testified that he knew that the information would have to come from ADT since the system could not be detected from merely going to the store and looking about.

8. F.S. 627.01081 reads as follows:
   "All statements and descriptions in any application for an insurance policy or annuity contract, or in negotiations therefor, by or in behalf of the insured or annuitant, shall be deemed to be representations and not warranties. Misrepresentations, omissions, concealments of facts, and incorrect statements shall not prevent a recovery under the policy or contract unless either:
   "(1) Fraudulent; or
   "(2) Material either to the acceptance of the risk, or to the hazard assumed by the insurer; or
   "(3) The insurer in good faith would either not have issued the policy or contract, or would not have issued it at the same premium rate, or would not have issued a policy or contract in as large an amount, or would not have provided coverage with respect to the hazard resulting in the loss, if the true facts had been made known to the insurer as required either by the application for the policy or contract or otherwise."

light of Washick's admitted knowledge that some of the information conveyed to him was erroneous,[9] since coverage had already been bound and Washick could not, therefore, have been relying on statements *subsequently* made. This also makes superfluous the District Court's further finding on the basis of expert testimony that the error should have put a reasonably prudent underwriter on notice that he should obtain further verification or make some further inquiry.[10]

We therefore accept the District Court's conclusion that coverage was not induced by any misrepresentation which Florida would regard as defeating coverage. The increased coverage under 2(A) was valid.

### III. Association

The second part of the case relates to off-premises coverage under 2(B)(3), note 2, *supra,* which provided $250,000 coverage for loss:

"in respect of property which is * * * in the custody of a dealer in property of the kind insured hereunder not employed by or *associated with* the Insured * * *." (Emphasis added).

Dadeland Mall and Sunset also sustained substantial losses as a result of the burglary at Ft. Lauderdale, since these stores had sent to Ft. Lauderdale approximately $200,000 worth of merchandise which Dadeland Mall and Sunset had received under "all risk memos" from the manufacturers and wholesalers. Sunset and Dadeland Mall claimed coverage under Clause 2(B)(3)[11] of *their* policies (366 HA 6584 and 655 HA 6585 respectively).

The controversy turns on whether or not Sunset and Dadeland Mall were "associated with" Ft. Lauderdale.

The District Court's finding that the stores were not associated was based on the fact that each of the six Mayor's Jewelry Stores are operated as separate entities for tax purposes. On the other hand, all six corporations are owned and controlled by the same interests (primarily President Getz) and it is undisputed that negotiations for all six insurance policies were carried on by Shore and Getz for all six stores at the same time. That included the three policies at issue. The central office, located at the Sunset premises, performed centralized accounting, purchasing, hiring, property leasing, master inventory, insurance and advertising functions for all stores. Only Getz, Shore and Getz' mother were authorized to draw checks on the bank accounts of any of the stores. The stores customarily exchanged and transferred large volumes of merchandise between each other on informal terms. Regardless of the tax setup, it is evident that, as a practical matter, the stores were operated like *one* enterprise with several branch outlets.

In sum, we think that the record compels a finding of a community of in-

9. Washick *knew* that the system had not been installed at the store "since its inception" and that the letter asserting the contrary could not have been correct, for he testified as follows:

"Q. You also got this letter from Gerry Schuh of the same date, the one that he typed out himself, and wrote you confirming the various conversation or conversations, and in which he used the words that it has been there since the inception. What significance did you place upon that?

A. None at all, because I knew that when we went on the risk that they did not have that line security protection. We knew that.

Q. What was your conclusion from the fact that Gerry Schuh was saying it in his letter? What did you believe it was that he was saying?

A. Well, it wasn't a correct statement."

10. Schuh's letter had also suggested that Washick contact ADT directly if he should desire further information.

11. Clause 2(E), which St. Paul argues applies to this loss, covered losses not included elsewhere in the policy, but limited to $25,000.

terest, a confluence of activity, a cooperation of efforts and a concentration of control—both financial and managerial. There can be no doubt that such evidence establishes that the stores are undeniably closely connected and therefore "associated," within the meaning of the insurance policy. The District Court's finding to the contrary is thus "clearly erroneous." F.R.Civ.P. 52(a).

■ Nor will estoppel carry the day for the assured. The District Court further found that, "since obtaining its Jeweler's Block Policies from [St. Paul], the [jewelry stores] have conducted their business relying on the fact that they were not 'employed by or associated with' each other within the meaning of Clause 2(B)(3); such reliance was and always has been known to [St. Paul]; and [St. Paul] is now estopped to claim or contend the contrary." This holding simply cannot be supported by the record. The experts testified that the purpose of the "associated with" exclusion is to enable the insurer to limit his risk exposure at any one location. Mayor's knew that St. Paul was unwilling to insure the Ft. Lauderdale location for more than $400,000. This limitation was made very clear to Mayor's and was acceptable to it. In a setting of six related branches each of which was covered under a separate policy the interpretation underlying the District Court's hypothesis would have meant that the Mayor enterprise would be covered up to $1,500,000 at each store on inter-store transfers, while paying premiums based on maximum risk exposure of $300,000 at each store. There is no basis to estop St. Paul from asserting that its precise limitation of risk was effective.

The result is that granting 2(B)(3) coverage for the goods of Dadeland Mall and Sunset was erroneous.

### IV. *A Tag End—Attorney Fees*

■ St. Paul also complains that the $68,000 award for attorney fees is excessive. In view of our substantial reversal, adjustment is required. Accordingly, on remand the District Court is directed to redetermine the allowance of attorney fees for the recovery allowed by this opinion.[12]

Affirmed in part;

Reversed in part;

Remanded with instructions.

AINSWORTH, Circuit Judge (concurring in part and dissenting in part):

I concur in the opinion of the Court except as to subdivision II, "No Misrepresentation," and the conclusion reached in that regard. I, therefore, dissent from the Court's holding that increased coverage under 2(A) of appellant's policy of insurance was valid in this case.

St. Paul's representatives made it clear to the insured that the additional $100,000 of coverage would only be bound "providing we had line security." (This, of course, referred to ADT Line Security at Fort Lauderdale and the quoted clause is excerpted from the testimony of Mr. Shore, the insured's representative. See App. 192.)

Whether Shore informed Schuh that ADT told him there was line security is not controlling when the Getz letter of February 3 is considered. The additional risk was orally bound on February 3 and the Getz letter was not received until February 4. However, the record shows that the Getz letter was required by the insurer as *verification and confirmation* of the fact of ADT Line Security at Fort Lauderdale. The letter unequivocally states that such security has "definitely" been installed at Fort Lauderdale. Thereafter, on February 9, St. Paul's endorsement No. 9 increasing coverage by $100,000 was issued on the

---

12. Ordinarily a remand for the trial court to fix attorney fees encompasses those for the subsequent successful appellate efforts. Here the trial court will have to consider the partial affirmance and the significant reversal.

strength of the representations in Getz' letter of February 3.

The Court's opinion erroneously concludes that the Getz letter of February 3 is of no consequence and must be disregarded in deciding this case since coverage had been orally committed prior to receipt of the letter. But the opinion ignores the fact that the letter was sent because it was required as verification and confirmation of the fact that line security had been installed in the Fort Lauderdale store and that oral binding of the risk was conditional on the insured furnishing such a letter with *definite* assurance that ADT was there.

It is clear that the insured misrepresented a material fact that there was line security at Fort Lauderdale. Whether this was unintentional is of no moment since *fraudulent* misrepresentation is not required under Florida law to vitiate the contract. See Life Insurance Company of Virginia v. Shifflet, Fla. 1967, 201 So.2d 715.